RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED Y-2
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK. M
DATE 12-19-03

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERK'S OFFICE

2003 DEC 19 P 3: 50

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| JACOB ELEPHANT, On Behalf of Himself and All Others Similarly Situated, | ) ) CIVIL ACTION NO. |
| Plaintiffs, | ) ) ) |
| v. | ) CLASS ACTION COMPLAINT ) |
| MASSACHUSETTS FINANCIAL SERVICES COMPANY, MFS INVESTMENT MANAGEMENT, SUN LIFE FINANCIAL, INC., MFS SERIES TRUST I, MFS SERIES TRUST II, MFS SERIES TRUST III, MFS SERIES TRUST IV, MFS SERIES TRUST V, MFS SERIES TRUST VI, MFS SERIES TRUST VII, MFS SERIES TRUST VIII, MFS SERIES TRUST IX, MFS SERIES TRUST X, MFS SERIES TRUST XI, MFS CAPITAL OPPORTUNITIES FUND, MFS CORE GROWTH FUND, MFS EMERGING GROWTH FUND, MFS LARGE CAP GROWTH FUND, MFS MANAGED SECTORS FUND, MFS MID CAP GROWTH FUND, MFS NEW DISCOVERY FUND, MFS NEW ENDEAVOR FUND, MFS RESEARCH FUND, MFS STRATEGIC GROWTH FUND, MFS TECHNOLOGY FUND, MASSACHUSETTS INVESTORS GROWTH STOCK, MFS MID CAP VALUE FUND, MFS RESEARCH GROWTH AND INCOME FUND, MFS TOTAL RETURN FUND, MFS UNION STANDARD EQUITY FUND, MFS UTILITIES FUND, MFS VALUE FUND, MASSACHUSETTS INVESTORS TRUST, MFS AGGRESSIVE GROWTH ALLOCATION FUND, MFS CONSERVATIVE ALLOCATION FUND, MFS MODERATE ALLOCATION FUND, MFS BOND FUND, MFS EMERGING MARKETS DEBT FUND, | ) **JURY TRIAL DEMANDED** ) ) ) ) MAGISTRATE JUDGE Dein ) ) ) ) 03-12570 NG ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| [Caption continues next page] | ) ) ) |

| | |
|---|---|
| MFS GOVERNMENT LIMITED MATURITY FUND, MFS GOVERNMENT MORTGAGE FUND, MFS GOVERNMENT SECURITIES FUND, MFS HIGH INCOME FUND, MFS HIGH YIELD OPPORTUNITIES FUND, MFS INTERMEDIATE INVESTMENT GRADE BOND FUND, MFS LIMITED MATURITY FUND, MFS RESEARCH BOND FUND, MFS STRATEGIC INCOME FUND, MFS ALABAMA MUNICIPAL BOND FUND, MFS ARKANSAS MUNICIPAL BOND FUND, MFS CALIFORNIA MUNICIPAL BOND FUND, MFS FLORIDA MUNICIPAL BOND FUND, MFS GEORGIA MUNICIPAL BOND FUND, MFS MARYLAND MUNICIPAL BOND FUND, MFS MASSACHUSETTS MUNICIPAL BOND FUND, MFS MISSISSIPPI MUNICIPAL BOND FUND, MFS MUNICIPAL BOND FUND, MFS MUNICIPAL LIMITED MATURITY FUND, MFS NEW YORK MUNICIPAL BOND FUND, MFS NORTH CAROLINA MUNICIPAL BOND FUND, MFS PENNSYLVANIA MUNICIPAL BOND FUND, MFS SOUTH CAROLINA MUNICIPAL BOND FUND, MFS TENNESSEE MUNICIPAL BOND FUND, MFS VIRGINIA MUNICIPAL BOND FUND, MFS WEST VIRGINIA MUNICIPAL BOND FUND, MFS EMERGING MARKETS EQUITY FUND, MFS GLOBAL EQUITY FUND, MFS GLOBAL GROWTH FUND, MFS GLOBAL TOTAL RETURN FUND, MFS INTERNATIONAL GROWTH FUND, MFS INTERNATIONAL NEW DISCOVERY FUND, MFS INTERNATIONAL VALUE FUND, MFS RESEARCH INTERNATIONAL FUND (the "MFS Funds"), and JOHN DOES 1 - 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Plaintiff alleges upon information and belief, except for paragraph 1 hereof, which is alleged upon knowledge, as follows:

## PARTIES

1.  Plaintiff Jacob Elephant is an owner of shares of the Massachusetts Investors Growth Stock Fund Class B, one of the MFS Funds (as defined above).

2.  Defendant Massachusetts Financial Services Company is a registered investment advisor located in Boston, Massachusetts. Massachusetts Financial Services Company manages the MFS family of mutual funds. Massachusetts Financial Services Company maintains its principal place of business at 500 Boylston Street, Boston, MA 02116.

3.  Defendant MFS Investment Management is a registered investment adviser located in Boston, Massachusetts. MFS Investment Management manages the MFS family of mutual funds. MFS Investment Management maintains its principal place of business at 500 Boylston Street, Boston, MA 02116.

4.  Defendants Massachusetts Financial Services Company and MFS Investment Management are referred to collectively as "MFS."

5.  Defendants MFS Series Trust I, II, III, IV, V, VI, VII, VIII, IX, X, and XI (collectively referred to as the "Fund Registrants") are the registrants of the MFS family of mutual funds. The Fund Registrants maintain a principal place of business at 500 Boylston Street, Boston, MA 02116.

6.  Defendants MFS family of funds (the "MFS Funds") include: MFS Capital Opportunities Fund, MFS Core Growth Fund, MFS Emerging Growth Fund, MFS Large Cap Growth Fund, MFS Managed Sectors Fund, MFS Mid Cap Growth Fund, MFS New Discovery Fund, MFS New Endeavor Fund, MFS Research Fund, MFS Strategic Growth Fund, MFS

Technology Fund, Massachusetts Investors Growth Stock, MFS Mid Cap Value Fund, MFS Research Growth and Income Fund, MFS Total Return Fund, MFS Union Standard Equity Fund, MFS Utilities Fund, MFS Value Fund, Massachusetts Investors Trust, MFS Aggressive Growth Allocation Fund, MFS Conservative Allocation Fund, MFS Moderate Allocation Fund, MFS Bond Fund, MFS Emerging Markets Debt Fund, MFS Government Limited Maturity Fund, MFS Government Mortgage Fund, MFS Government Securities Fund, MFS High Income Fund, MFS High Yield Opportunities Fund, MFS Intermediate Investment Grade Bond Fund, MFS Limited Maturity Fund, MFS Research Bond Fund, MFS Strategic Income Fund, MFS Alabama Municipal Bond Fund, MFS Arkansas Municipal Bond Fund, MFS California Municipal Bond Fund, MFS Florida Municipal Bond Fund, MFS Georgia Municipal Bond Fund, MFS Maryland Municipal Bond Fund, MFS Massachusetts Municipal Bond Fund, MFS Mississippi Municipal Bond Fund, MFS Municipal Bond Fund, MFS Municipal Limited Maturity Fund, MFS New York Municipal Bond Fund, MFS North Carolina Municipal Bond Fund, MFS Pennsylvania Municipal Bond Fund, MFS South Carolina Municipal Bond Fund, MFS Tennessee Municipal Bond Fund, MFS Virginia Municipal Bond Fund, MFS West Virginia Municipal Bond Fund, MFS Emerging Markets Equity Fund, MFS Global Equity Fund, MFS Global Growth Fund, MFS Global Total Return Fund, MFS International Growth Fund, MFS International New Discovery Fund, MFS International Value Fund, and MFS Research International Fund are mutual funds that are registered under the Investment Company Act and managed by MFS with its principal place of business located at 500 Boylston Street, Boston, MA 02116. The prospectuses issued pursuant to or traceable to the offerings of the MFS Funds are referred to as the "Prospectuses".

through the present, who were damaged thereby (except the Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants and those who have engaged in the wrongful activities described herein) and their successors in interest, who are or will be threatened with injury arising from Defendants' actions as more fully described herein (the "Class").

13. This action is properly maintainable as a class action.

14. The Class is so numerous that joinder of all members is impracticable. There are millions of shares of the mutual fund outstanding.

15. There are questions of law and fact which are common to the Class including, *inter alia*, the following: (a) whether Defendants have breached their fiduciary, statutory and other common law duties owed by them to Plaintiff and the members of the Class; (b) whether Defendants have violated the Investment Company Act; and (c) whether Defendants have benefitted to the detriment of Plaintiff and the other members of the Class.

16. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. The claims of the Plaintiff are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class. Plaintiff will fairly and adequately represent the Class.

17. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of

this action as a class action. This Court is an appropriate forum for this dispute.

## SUBSTANTIVE ALLEGATIONS

18. Mutual funds are designed for buy-and-hold investors, and are therefore the favored homes for Americans' retirement and college savings accounts. Nevertheless, quick-turnaround traders routinely try to trade in and out of certain mutual funds in order to exploit inefficiencies in the way they set their NAVs.

19. This strategy works only because some funds use "stale" prices to calculate the value of securities held in the fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that holds Japanese shares. Because of the time zone difference, the Japanese market may close at 2:00 a.m. New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his or her fund to arrive at an NAV at 4:00 p.m. in New York, he or she is relying on market information that is fourteen hours old. If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and the fund's NAV will be artificially low. Put another way, the NAV does not reflect the true current market value of the stocks the fund holds. On such a day, a trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling. Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

20. An additional scheme utilized by John Does and the Defendants herein was "late trading." Mutual funds are valued once a day, usually at 4:00 p.m. EST, when the New York

market closes. The price, known as the Net Asset Value or "NAV," generally reflects the closing prices of the securities that comprise a given fund's portfolio, plus the value of any cash that the fund manager maintains for the fund. A mutual fund stands ready to buy or sell (the mutual fund industry refers to sales as "redemptions") its shares at the NAV with the public all day, any day – but unlike a stock, the price of a mutual fund does not change during the course of the day. Accordingly, orders placed at any time during the trading day up to the 4:00 p.m. cutoff get that day's NAV, but an order placed at 4:01 p.m. or thereafter receives the next day's NAV. This is the rule of "forward pricing," which became law in 1968.

21.   This system assures a level playing field for investors. Mutual fund investors do not know the exact price at which their mutual fund orders will be executed at the time they place the orders (unlike stock investors), because NAVs are calculated after the market closes. Orders placed on or before 4 p.m. on a given day are filled at the NAV determined that day while orders placed after 4 p.m. are filled at the NAV calculated the next day. Thus, all investors have the same opportunity to assemble "pre-4:00 p.m. information" before they buy or sell. And no investor has (or at least is supposed to have) the benefit of "post-4:00 information" prior to making an investment decision. The importance of this protection becomes clear when, for example, there is an event after 4:00 p.m. (like an unexpectedly positive corporate earnings announcement) that makes it highly probable that the market for the stocks in a given fund will open sharply higher the next day. Forward pricing ensures fairness: those who bought the fund during the day, before the information came out, will enjoy a gain. Those who buy shares in the fund after the announcement are not supposed to share in this profit. Their purchase order should receive the NAV set at the end of the next day, when the market will have digested the news and

reflected its impact in (1) higher prices for the stock held by the fund and therefore (2) a higher NAV for the fund.

22. An investor who has the ability to avoid forward pricing and buy at the prior NAV enjoys a significant trading edge. He or she can wait until after the market closes for significant news such as the above-earnings announcement to come out, and then buy the fund at the old, low NAV that does not reflect the impact of the new information. When the market goes up the next day, the lucky investor would be able to sell and realize an arbitrage profit based solely on the privilege of trading on the "stale" NAV.

23. The late trader's arbitrage profit comes dollar for dollar from the mutual fund itself. In essence, the late trader is being allowed into the fund after it is closed for the day to participate in a profit that would otherwise have gone completely to the fund's buy-and-hold investors. When the late trader redeems his shares and claims his profit, the mutual fund manager has either to sell stock or use cash on hand – stock and cash that used to belong to the long-term investors – to give the late trader his gain. The forward pricing rule was enacted to prevent this kind of abuse. *See* 17 C.F.R. § 270.22c-1(a).

24. Like late trading, effective timing captures an arbitrage profit. And like late trading, the arbitrage profit from timing comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days – as John Does did – the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

7

25. Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their transaction costs on the long-term investors. Indeed, trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market. Accordingly, fund managers often seek to minimize the disruptive impact of timers by keeping cash on hand to pay out the timers' profits without having to sell stock. This "strategy" does not eliminate the transfer of wealth out of the mutual fund caused by timing; it only reduces the administrative cost of those transfers. However, at the same time it can also reduce the overall performance of the fund by requiring the fund manager to keep a certain amount of the funds' assets in cash at all times, thus depriving the investors of the advantages of being fully invested in a rising market. Some fund managers even enter into special investments as an attempt to "hedge" against timing activity (instead of just refusing to allow it), thus deviating altogether from the ostensible investment strategy of their funds, and incurring further transaction costs.

26. Mutual fund managers are aware of the damaging effect that timers have on their funds. While it is virtually impossible for fund managers to identify every timing trade, large movements in and out of funds – like those made by John Does – are easy for managers to spot. And mutual fund managers have tools to fight back against timers.

27. Fund managers typically have the power simply to reject timers' purchases. As fiduciaries for their investors, mutual fund managers are obliged to do their best to use these weapons to protect their customers from the dilution that timing causes.

28. The incentive to the Defendant mutual funds to engage in such wrongdoing is as

8

follows. Typically a single management company sets up a number of mutual funds to form a family. While each mutual fund is in fact its own company, as a practical matter the management company runs it. The portfolio managers who make the investment decisions for the funds and the executives to whom they report are all typically employees of the management company, not the mutual funds themselves. Still, the management company owes fiduciary duties to each fund and each investor.

29. The management company makes its profit from fees it charges the funds for financial advice and other services. These fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the manager makes. The timer understands this perfectly, and frequently offers the manager more assets in exchange for the right to time. Fund managers have succumbed to temptation and allowed investors in the target funds to be hurt in exchange for additional money in their own pockets in the form of higher management fees.

30. Thus, by keeping money – often many million dollars – in the same family of mutual funds (while moving the money from fund to fund), John Does assured the manager that he or she would collect management and other fees on the amount whether it was in the target fund, the resting fund, or moving in between. In addition, sometimes the manager would waive any applicable early redemption fees. By doing so, the manager would directly deprive the fund of money that would have partially reimbursed the fund for the impact of timing.

31. As an additional inducement for allowing the timing, fund managers often received "sticky assets." These were typically long-term investments made not in the mutual fund in which the timing activity was permitted, but in one of the fund manager's financial

9

vehicles (*e.g.*, a bond fund or a hedge fund run by the manager) that assured a steady flow of fees to the manager.

32. These arrangements were never disclosed to mutual fund investors. On the contrary, many of the relevant mutual fund prospectuses during the Class Period contained materially misleading statements assuring investors that the fund managers discouraged and worked to prevent mutual fund timing and late trading. Nevertheless, as described further below, John Does were allowed to time and late trade several of the MFS Funds subject to such a prospectus.

33. On September 3, 2003, the New York State Attorney General Elliot Spitzer (the "Attorney General") attacked the mutual fund industry by filing a complaint charging fraud against Edward J. Stern and Canary Capital Partners, LLC in connection with the unlawful mutual fund practices of late trading and timing. More specifically, the Attorney General alleged the following: "Canary developed a complex strategy that allowed it to in effect sell mutual funds short and profit on declining NAVs." Additionally, the Attorney General alleged that Canary set up arrangements with Bank of America, Bank One, Janus, and Strong to late trade and time those companies' respective mutual funds. The Attorney General further alleged:

> Bank of America. . .(i) set Canary up with a state-of-the art electronic late trading platform, allowing it to trade late in the hundreds of mutual funds that the bank offers to its customers, (ii) gave Canary permission to time the Nations Funds Family (iii) provided Canary with approximately $300 million of credit to finance this late trading and timing, and (iv) sold Canary the derivative short positions it needed to time the funds as the market dropped. None of these facts were disclosed in the Nations Funds prospectuses. In the process, Canary became one of Bank of America's largest customers. The relationship was mutually beneficial in that Canary made tens of millions through late trading

10

and timing, while the various parts of the Bank of America that served Canary made millions themselves.

34. In connection with an examination of active trading of mutual fund shares by the SEC and the Attorney General, MFS and Sun Life received inquiries and subpoenas for documents from those agencies.

35. On December 8, 2003, Sun Life and MFS announced that the staff of the Boston office of the SEC had indicated that it intended to recommend to the SEC that an enforcement action be taken against MFS alleging, in effect, that the disclosure in certain of MFS' fund prospectuses concerning market timing was false and misleading.

36. On December 9, 2003, *The New York Times* (the "Times") reported that MFS "allowed privileged clients to trade quickly in and out of its biggest funds while saying it restricted the practice for the vast majority of its shareholders, according to a memorandum from a senior company executive." The Times further reported that the memorandum showed that in 2001, executives at MFS essentially created two classes of funds – a small group of large funds that would accept rapid-fire trades, a practice known as market timing, and a larger group of international funds that would not. At no time, though, did MFS change the language in its Prospectuses, which stated that market timing was not permitted in any of its funds. Additionally, the Times reported that "[a]mong the most popular offerings was MFS Emerging Growth, one of the five equity funds that MFS made available to market timers. But no restrictions were placed on Massachusetts Investors Trust, Massachusetts Investors Growth Stock Fund, MFS Research Fund, MFS Total Return Fund or the emerging growth fund. The rationale was that because these funds were very large and liquid, excessive trading would not harm

11

shareholders."

37. The actions of the Defendants have harmed Plaintiff and members of the Class. In essence, the Defendants' actions of allowing market timing to occur have caused Plaintiff and members of the Class' shares to be diluted in value.

### THE MFS MUTUAL FUNDS' PROSPECTUSES WERE MATERIALLY FALSE AND MISLEADING

38. The Prospectuses stated that "MFS Funds do not permit market timing or other excessive trading practices. Excessive, short-term (market timing) trading practices may disrupt portfolio management strategies and harm fund performance. MFS Funds will reject or restrict an investor's purchase orders if there is a history of market timing. . . Requests to exchange shares of MFS global and international funds that have not been held for 15 days will be refused. . . ."

39. Given that MFS allowed market timing of its funds to occur, its Prospectuses were false and misleading because it failed to disclose the following: (a) Defendants had entered into unlawful agreements allowing the John Does to time their trading of the MFS Funds; (b) pursuant to those agreements, the John Does regularly timed the MFS Funds; (c) contrary to the representations in the Prospectuses, MFS only enforced their policy against frequent traders selectively; (d) the Defendants regularly allowed the John Does to engage in trades that were disruptive to the efficient management of the MFS Funds and/or increased the MFS Funds' costs, thereby reducing the MFS Funds' actual performance; and (e) the Prospectuses failed to disclose that, pursuant to the unlawful agreements, the John Does benefitted financially at the expense of MFS Funds' investors including Plaintiff and other members of the Class.

## COUNT ONE
## FOR VIOLATIONS OF SECTION 34(b) OF
## THE INVESTMENT COMPANY ACT OF 1940 AGAINST ALL DEFENDANTS

40. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41. Through the course of conduct alleged herein, Defendants have made untrue statements of material fact and/or omitted to state facts necessary to make the statements not misleading in violation of Section 34 of the Investment Company Act.

42. As a result of Defendants' wrongful conduct alleged herein, Plaintiff and the other members of the Class have suffered damages.

## COUNT TWO
## FOR BREACH OF FIDUCIARY DUTY

43. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44. By engaging in the wrongdoing alleged herein, Defendants have breached and are breaching their fiduciary duties owed to Plaintiff and the other members of the Class.

45. Plaintiff and the Class have been specially injured by Defendants' wrongdoing. For example, those Class members who redeemed their shares during the Class Period received less than what they would have been entitled to had certain individuals not engaged in illegal market timing (and late trading). Additionally, certain members of the Class (*i.e.*, those who purchased their mutual fund shares legally), were treated differently than those purchasers that were market timers (and/or late traders). Defendants acted in bad faith in connection with the wrongful conduct complained of in this complaint.

46.     Additionally, Defendants have breached their duty of candor owed to Plaintiff and the Class.

## COUNT THREE
## FOR COMMON LAW FRAUD

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     As alleged herein, Defendants each made or participated in making material misrepresentations, or omitted to disclose material facts, to Plaintiff, its agents, and the investing public concerning the mutual funds.

49.     Defendants' misrepresentations and omissions were made intentionally or recklessly or with no reasonable ground for believing them to be true, to induce reliance thereon by Plaintiff and its agents, and the investing public when making investment decisions.

50.     The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit.

51.     Plaintiff and/or its agents reasonably relied on Defendants' representations and statements.

52.     As a result of the fraud and deceit of Defendants, Plaintiff suffered damages.

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

(1)     Declaring this action to be a class action and certifying Plaintiff as the class representative and Plaintiff's counsel as class counsel;

(2)     Enjoining, preliminarily and permanently, the transactions complained of herein;

(3)  Directing that Defendants account to Plaintiff and the other members of the Class for all damages caused to them and account for all profits and any special benefits obtained as a result of their unlawful conduct;

(4)  Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(5)  Granting Plaintiff and the other members of the Class such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 19, 2003

MOULTON & GANS, P.C.

Nancy Freeman Gans, BBO #184540
33 Broad Street, Suite 1100
Boston, Massachusetts 02109-4216
(617) 369-7979
(617) 369-7980 (facsimile)

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Sandy A. Liebhard
U. Seth Ottensoser
Joseph R. Seidman, Jr.
10 East 40th Street
New York, NY 10016
(212) 779-1414
(212) 779-3218 (facsimile)

**Attorneys For Plaintiff**